670 A.2d 658

**Lillian BURGSTAHLER, Appellee,**

v.

**ACROMED CORPORATION, Appellant.**

Superior Court of Pennsylvania.

Argued June 6, 1995.

Filed Dec. 19, 1995.

Reargument Denied Feb. 20, 1996.

28

Louis A. Bove, Philadelphia & Mark Herrmann, Pro Hac Vice, Cleveland, Ohio, for appellant.

Martin Heller, Philadelphia, for appellee.

Before McEWEN, TAMILIA and KELLY, JJ.

McEWEN, Judge:

This Court granted the motion filed by appellant, AcroMed Corporation, pursuant to Pa.R.A.P. 1311, for leave to file an interlocutory appeal from an order which denied its motion for summary judgment, thus requiring that we determine whether the trial court properly found that the state law claims of the plaintiff, Lillian Burgstahler, had not been preempted by the

Medical Device Amendments of 1976 ("The MDAs"), 21 U.S.C. §§ 360c *et seq.*

## FACTUAL BACKGROUND

Appellee, Lillian Burgstahler, suffered a herniated disc as a result of a work-related accident on June 3, 1983. After a two-month course of bed rest and other non-surgical therapies, administered over a four-year period, failed to provide any relief, Burgstahler entered Thomas Jefferson University Hospital on January 18, 1987, under the care of Sanford Davne, M.D., an orthopedic surgeon and Donald L. Myers, M.D., a neurosurgeon. These doctors diagnosed Ms. Burgstahler as suffering from a bulging disc between her fourth and fifth lumbar vertebrae and recommended that Ms. Burgstahler undergo surgery to remove the disc and fuse the adjacent vertebrae.

Surgery was performed on January 19, 1987, by Dr. Davne and Dr. Myers, who performed an L–4–5 bilateral decompression laminotomy, foraminotomies, and L–4–5 diskectomy and fusion with allograft, autograft, and the implantation, as spinal fixation devices, of nested bone plates and cancellous bone screws manufactured by AcroMed Corporation and sold under the trade name "VSP Bone Plates" and "VSP Bone Screws."[1]

Dr. Davne, who had attended in May of 1986, a two-day course conducted by Arthur D. Steffee, M.D., the inventor of the bone plate and screws, testified in a deposition that he was aware at all relevant times, that AcroMed's VSP bone plates and bone screws had been approved by the FDA for use only in the long bones of the extremities.[2]

The surgery performed by Dr. Davne and Dr. Myers provided appellee with only a short respite from her symptoms

1. "VSP" is an acronym for "variable screw placement."

2. The plaintiff in *Corrigan v. Methodist Hosp.*, 853 F.Supp. 832 (E.D.Pa. 1994), alleged that the physician defendants therein, Dr. Sanford Davne and Dr. Donald Myers "had a financial interest in AcroMed by virtue of the fact that they held stock options and served as members of AcroMed's Medical Advisory Board.... [and had] engaged in a civil conspiracy to circumvent FDA restrictions on the marketing, labeling and use of the AcroMed VSP system...." *Corrigan v. Methodist Hosp.*, *supra*, 853 F.Supp. at 833–34.

and on August 25, 1987, x-rays revealed that the graft had not fused and that two inferior screws had broken. The bone plates and screws were removed during surgery, performed by a different physician, on June 23, 1988, and this action was subsequently instituted by appellee.

Appellee Burgstahler alleged in her complaint that AcroMed was liable for injuries resulting from the use of the VSP nested bone plate and screws as a result of its conduct in:

(a) supplying a defective VSP plate and screws;

(b) manufacturing a defective VSP plate and screws;

(c) failing properly to fabricate the aforesaid VSP plate and screws;

(d) failing properly and adequately to inspect the aforesaid VSP plate and screws;

(e) failing to warn of the defective condition; [and]

(f) failing to provide sufficient or proper information regarding the use of the aforesaid VSP plate and screws.

Appellant filed a motion for summary judgment, contending that it was entitled to judgment in its favor on all claims asserted by appellee due to the preemption afforded by section 360k(a) of the MDAs. Appellant argued in the alternative that the claims asserted by appellee based upon failure to warn or provide appropriate information on the proper use of the device were barred by application of the learned intermediary doctrine since the parties agree that the VSP nested bone plates and cancellous screws are available only upon the prescription of a physician.

The learned Judge Sandra Mazer Moss denied the motion for summary judgment, finding that the preemption provisions of the MDAs did not preempt all state tort claims since the device at issue was a Class II rather than a Class III device. The trial court did not address the argument of appellant that appellee's failure to warn claim was barred by application of the learned intermediary doctrine.

## THE MDAs

The Medical Device Amendments of 1976 ("the MDAs"), 21 U.S.C. §§ 360c–360k (Supp.1995), to the Federal Food, Drug, and Cosmetic Act of 1938, 21 U.S.C. §§ 301 *et seq.*, were enacted:

> "To assure the reasonable safety and effectiveness of medical devices intended for human use." H.Conf.Rep. No. 1090, 94th Cong.2d Sess. reprinted in 1976 U.S.Code Cong. & Admin.News 1070, 1103. The MDA gives the FDA broad powers to classify and regulate medical devices. Under the MDA, the FDA must assign a medical device to one of three statutorily delineated categories. Class I devices are those devices which pose little or no threat to public health. They are subject to only general requirements concerned with their manufacture. Tongue depressors are one example of a Class I medical device. *See:* 21 U.S.C. § 360c(a)(1)(A); 21 C.F.R. § 860.3(c)(1). *Class II devices include items such as tampons and oxygen masks. Use of Class II devices involves some risk of injury and, as a result, the FDA establishes performance standards, postmarket surveillance programs and guidelines for their use. See:* 21 U.S.C. § 360c(a)(1)(B); 21 CFR § 860.3(c)(2). Class III devices are those devices which are implanted in the body or which pose a potentially unreasonable risk of injury. *See:* 21 U.S.C. § 360c(a)(1)(C); 21 CFR § 860.3(c)(3). They include Zyderm, as well as pacemakers, heart valves and replacement joints. Because of their inherent dangerousness, Class III devices are subject to the most stringent FDA regulation. All Class III devices are required to obtain premarket approval prior to being released for sale and use. 21 U.S.C. § 360e; 21 CFR § 814.1(c).

*Kennedy v. Collagen Corp.,* 67 F.3d 1453, 1455 (9th Cir.1995) (emphasis supplied). *Accord: Feldt v. Mentor Corp.,* 61 F.3d 431, 433 (5th Cir.1995); *Lohr v. Medtronic, Inc.,* 56 F.3d 1335, 1339–40 (11th Cir.1995); *Michael v. Shiley, Inc.,* 46 F.3d 1316, 1319 (3rd Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 67, 133 L.Ed.2d 29 (1995); *Talbott v. C.R. Bard, Inc.,* 865 F.Supp. 37, 42–43 (D.Mass.1994), *aff'd.,* 63 F.3d 25 (1st Cir.1995); *Green v.*

*Dolsky,* 433 Pa.Super. 556, 561, 641 A.2d 600, 603, *allo. granted,* 539 Pa. 678, 652 A.2d 1324 (1994).

Class III devices may not be marketed or sold until the sponsoring company obtains Premarket Approval (PMA) from the FDA. *Id.* § 360e. To obtain a PMA, the sponsor must submit "all information, published or known to or which should reasonably be known to the applicant, concerning investigations which have been made to show whether or not such device is safe and effective," *Id.* § 360e(c)(1)(A), a statement of the intended use of the product, a description of the expected manufacturing processes for the device, and any other information requested by the FDA. *Id.* § 360e(c)(1)(B)–(G). After review by a panel of medical experts, the FDA may approve the PMA.

*Michael v. Shiley, Inc., supra,* 46 F.3d at 1320.

Although as a general rule Class II and Class III devices must obtain Premarket Approval (PMA) before they may be marketed to the public, 21 U.S.C. § 360e(c), the MDAs grandfathered into the market all devices introduced before May 28, 1976, the effective date of the Act, *see:* 21 U.S.C. § 360e(b)(1)(A); 21 C.F.R. § 814.1(c)(1), and permit the sale of a device without PMA where the device is the "substantial equivalent" of a device already on the market, including a device which was grandfathered into the market by virtue of having been first sold prior to May 28, 1976. 21 U.S.C. § 360e(b)(1)(B); 21 C.F.R. § 807.87. The manufacturer must submit a Premarket Notification (PMN), also known as a 510(k) notification, which includes specified information 90 days before marketing a device. The FDA must then clear the device for marketing. 21 U.S.C. § 360(k); 21 C.F.R. §§ 807.87, 807.90, 807.100; *Duvall v. Bristol–Myers–Squibb Co.,* 65 F.3d 392, 396 (4th Cir.1995).

The Pre–Market Notification process requires applicants to submit descriptions of their devices and other information necessary for the agency to determine whether the devices are substantially equivalent. As with the Pre–Market Approval process, Pre–Market Notification applicants must also submit their proposed labeling. *Id.* If the FDA

determines that a device is substantially equivalent to a device that was on the market prior to the enactment of the MDAs in 1976, the applicant is free to market the device. *Reeves v. AcroMed Corp.*, 44 F.3d 300, 303 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2251, 132 L.Ed.2d 258 (1995). *See also: Lohr v. Medtronic, Inc., supra,* 56 F.3d at 1340; 21 U.S.C. § 360(k), 360c(f)(1).

The VSP plate and screws at issue in the instant case have, as a result of proceeding through the PMN process, been designated as Class II medical devices, substantially equivalent to earlier marketed devices, and subject only to general controls [3] regarding labeling, reporting, and manufacturing. 21 U.S.C. § 360c(a)(1)(A)–(B).

William R. Christianson, the Vice President of Regulatory Affairs and Quality Assurance for AcroMed Corporation described in his affidavit of February 16, 1994, the PMN process in which AcroMed participated prior to marketing the VSP plates and screws:

AcroMed's nested bone plates and cancellous bone screws were submitted to the FDA pursuant to the FDA's 510(k) pre-market notification procedure. In 1985, AcroMed submitted a 510(k) application for its nested bone plates. In 1986, AcroMed submitted a similar notification for its cancellous bone screws. These notifications included the information required by the FDA to make substantial equivalence determinations, including examples of pre–1976 devices, design specifications, and proposed labeling. AcroMed's nested bone plates and cancellous bone screws were cleared for marketing by the FDA under the 510(k) provisions in February 1986. A modified version of

---

**3.** Class II devices *may* also "be subject to recommendations, guide-lines, post-marketing surveillance, the development of patient registries, and even the promulgation of specific performance standards, *should the FDA deem them a sufficient health hazard as to require strict product specifications or warnings." Stamps v. Collagen,* 984 F.2d 1416, 1418 (5th Cir.) (citing *see* 21 U.S.C. § 360c(a)(1)(B)), *cert. denied,* —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993); *see also* 21 C.F.R. § 860.3(c)(2).
*Parenteau v. Johnson & Johnson Orthopedics, Inc.,* 856 F.Supp. 61, 64 (D.N.H.1994) (emphasis supplied).

AcroMed's cancellous bone screws was subsequently cleared for marketing by the FDA in January 1988.

The FDA has issued only one regulation applicable to bone plates and screws, and its purpose is to classify long bone screws and plates as Class II medical devices:

§ 888.3030 **Single/multiple component metallic bone fixation appliances and accessories.**

(a) *Identification.* Single/multiple component metallic bone fixation appliances and accessories are devices intended to be implanted consisting of one or more metallic components and their metallic fasteners. The devices contain a plate, a nail/plate combination, or a blade/plate combination that are made of alloys, such as cobalt-chromium-molybdenum, stainless steel, and titanium, that are intended to be held in position with fasteners, such as screws and nails, or bolts, nuts, and washers. These devices are used for fixation of fractures of the proximal or distal end of long bones, such as intracapsular, intertrochanteric, intercervical, supracondylar, or condylar fractures of the femur; for fusion of a joint; or for surgical procedures that involve cutting a bone. The devices may be implanted or attached through the skin so that a pulling force (traction) may be applied to the skeletal system.

(b) *Classification.* Class II.

21 C.F.R. § 888.3030. Other than this identification and classification regulation, the parties have not directed this Court to, nor have we found, any other FDA regulations specifically applicable to long bone screws and plates. The FDA's own regulations provide that its acceptance of a claim that a device is "substantially equivalent to a device in commercial distribution before May 28, 1976, ... *does not in any way denote official approval of the device* ...." 21 C.F.R. 807.97 (emphasis supplied). At least two federal courts have expressly found that the "510(k) approval under the MDA, standing alone, is not a finding of safety and effectiveness and does not impose specific requirements on a device for preemption purposes." *Lohr v. Medtronic, Inc., supra,* 56 F.3d at 1349. *Accord: National Bank of Commerce v. Kimberly–*

*Clark Corp.*, 38 F.3d 988, 998 (8th Cir.1994). *See also: Brown v. Medtronic, Inc.*, 852 F.Supp. 717, 720–21 (S.D.Ind.1994) (general regulations for Class II devices do not rise to the level causing preemption under the MDAs).

The trial judge denied the motion for summary judgment submitted by appellant based upon her finding that the MDAs did not preempt the causes of action set forth in the complaint of appellee where the VSP bone plates and screws were Class II devices which had been marketed as substantial equivalents of devices grandfathered into the market. Our review of the applicable law compels agreement with the trial court as to the allegations of the complaint based upon negligence in the manufacture and sale of the devices. We find, however, that the preemption provisions of the MDAs preclude any state tort action based upon inadequate labeling [4] of the product and failure to warn.

## PREEMPTION

**Under the supremacy clause of the United States Constitution, federal law is "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, Cl. 2. As a result, all conflicts between federal and state laws must be resolved in favor of federal law. *Buzzard v. Roadrunner Trucking, Inc.*, 966 F.2d 777 (3d Cir.1992). In determining whether a conflict between state and federal law exists, a court looks to congressional intent. *FMC Corp. v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990), *appeal after remand*, 932 F.2d 959 (1991).**

Generally, preemption may be express or implied, and it is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. *Id.*, 498 U.S. at 56–57, 111 S.Ct. at 407,

---

**4.** We do not include in this analysis any claim based upon fraudulent labeling or upon labeling which fails to meet the requirements specifically imposed by federal regulations. *See: Taurino v. Ellen*, 397 Pa.Super. 50, 57 n. 3, 579 A.2d 925, 929 n. 3 (1990), *allo. denied*, 527 Pa. 603, 589 A.2d 693 (1991).

112 L.Ed.2d at 363. "Congress' enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not preempted." *Cipollone v. Liggett Group, Inc.,* [505] U.S. [504], 516, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407, 423 (1992) (holding that the Federal Cigarette Labeling and Advertising Act of 1965 and its amendment preempted some but not all of a lung cancer victim's state law tort claims). When Congress is silent on the matter, state law will be preempted by federal law "when (a) compliance with both state and federal law is impossible or, (b) when state law stands as an impediment to a federal purpose." *Hunsaker v. Surgidev Corp.,* 818 F.Supp. 744, 747 (M.D.Pa.1992).

*Green v. Dolsky, supra,* 433 Pa.Super. at 559, 641 A.2d at 602.

The express preemption provision of the MDAs, 21 U.S.C. § 360k(a), upon which appellant relies for its argument, provides:

[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use *any requirement—*

(1) *which is different from, or in addition to, any requirement applicable under this chapter to the device,* and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a) (emphasis supplied).

The FDA has interpreted this statutory preemption as applicable to state common law tort claims as well as state legislation. The regulations promulgated by the FDA in response to the preemption statute provide:

[N]o State or political subdivision of a State may establish or continue in effect *any requirement* with respect to a medical device intended for human use having the force and effect of law *(whether established by statute,* ordinance, regulation, *or court decision* ) which is different from, or in

addition to, any requirement applicable to such device under any provision of the act. . . .

21 C.F.R. 808.1(b) (emphasis supplied).

However, those same regulations further explain:

State or local requirements are preempted *only* when the Food and Drug Administration has established *specific counterpart regulations or there are other specific requirements applicable to a particular device under the act,* thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.

21 C.F.R. 808.1(d) (emphasis supplied).

 Many of the courts which have more recently addressed the preemption issue in the context of a Class II medical device have found that the action is not pre-empted by Section 360k of the MDAs where there is no *specific* FDA requirement or regulation applicable to the device at issue so that the state court ruling sought by the plaintiff would neither impose requirements different from or additional to a FDA requirement. *See: Michael v. Shiley, Inc., supra,* 46 F.3d at 1323; *National Bank of Commerce v. Kimberly–Clark Corp., supra,* 38 F.3d at 997; *Moore v. Kimberly–Clark Corp.,* 867 F.2d 243, 246 (5th Cir.1989); *Ginochio v. Surgikos, Inc.,* 864 F.Supp. 948, 953 (N.D.Cal.1994); *Parenteau v. Johnson & Johnson Orthopedics, Inc., supra,* 856 F.Supp. at 64–65; *Brown v. Medtronic, Inc., supra,* 852 F.Supp. at 721; *Mulligan v. Pfizer, Inc.,* 850 F.Supp. 633, 635–37 (S.D.Ohio 1994); *Elbert v. Howmedica, Inc.,* 841 F.Supp. 327, 331 (D.Haw. 1993); *Lamontagne v. .E.I. DuPont de Nemours & Co.,* 834 F.Supp. 576, 582–86 (D.Conn.1993), *aff'd.,* 41 F.3d 846 (2d Cir.1994); *Larsen v. Pacesetter Sys., Inc.,* 74 Haw. 1, 14, 837 P.2d 1273, 1282 (1992).

The Supreme Court of Hawaii, in rejecting the preemption argument urged upon it by the manufacturer of a pacemaker, concluded that the FDA's own regulations precluded a finding of preemption:

In 1978, the Food and Drug Administration (FDA) promulgated regulations implementing § 360k. Under 21 C.F.R. § 808.1(b) (1992), § 360k applies to any state requirement "having the force and effect of law (whether established by statute, ordinance, regulation or court decision)...." Under 21 C.F.R. § 808.1(d) (1992): "State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act...."

The language of § 808.1(d) is consistent with that of § 360k. An examination of the language and legislative history of the Medical Device Amendments, as they existed when § 808.1(d) was promulgated in 1978, reveals no clearly expressed legislative intent contrary to the regulation. The regulation's somewhat restrictive reading of § 360k(a)(2) is also consistent with the legislative history of the Act, which reveals that Congress was concerned with *increasing* the protection afforded medical device consumers under existing law rather than with *restricting* or reforming the law in existence at the time of the Act. Moreover, in 1990, subsequent to FDA promulgation of § 808.1(d), Congress amended the Medical Device Amendments of 1976. The purpose of the legislation was to "modify the underlying law in ways that will result in *greater* protection of the public health." H.R.Rep. No. 808, 101st Cong., 2d Sess. 13, *reprinted in* 1990 U.S.Code Cong. & Admin.News 6305, 6306 (emphasis added). The 1990 amendments left § 360k untouched, providing evidence that § 808.1(d) is an accurate reflection of Congressional intent under § 360k. We conclude that both § 360k and § 808.1(d) govern the scope of preemption under the Medical Device Amendments.

*Larsen v. Pacesetter Sys. Inc.*, *supra* at 13, 837 P.2d at 1281 (emphasis in original). *See: Mulligan v. Pfizer, Inc.*, *supra*, 850 F.Supp. at 635–36. While the Hawaii Supreme Court had under scrutiny a Class III device, the apt discussion of the regulations by that court is, nonetheless, relevant to our study

of a Class II device since the regulations are applicable to both Class II and Class III medical devices.

. The parameters of the preemptive effect of Section 360k of the MDAs having been defined, we proceed to apply the general principles of preemption to each of the claims set forth in the complaint filed by appellee to determine whether it is preempted. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 522, 112 S.Ct. 2608, 2621, 120 L.Ed.2d 407, 427 (1992); *Lohr v. Medtronic, Inc., supra*, 56 F.3d at 1347; *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 17 (1st Cir.1994); *Parenteau v. Johnson & Johnson Orthopedics, Inc., supra*, 856 F.Supp. at 64. .

## PREEMPTION OF CLAIMS BASED UPON MANUFACTURE AND SALE

A decision by either court or jury against appellant upon a claim of appellee based upon manufacture and delivery of a defective VSP nested bone plate and cancellous screws, or a claim based upon the failure to properly and adequately inspect the devices before sale, will not impose "requirement[s]" which are "different from, or in addition to" any specific requirement imposed under federal law and will not "relate[ ] to ... any matter" included in a specific MDAs requirement. 21 U.S.C. § 360k(a); 21 C.F.R. 808.1. As a result, and in recognition of the principle that " 'the historic police powers of the States [are] not to be superseded by ... [a] Federal Act unless that [is] the clear and manifest purpose of Congress[,]' " *Cipollone v. Liggett Group, Inc., supra*, 505 U.S. at 514, 112 S.Ct. at 2617, 120 L.Ed.2d at 422, *quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459 (1947), and cognizant of the equally strong presumption against preemption if it would deny a party access to *all* judicial remedies, *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 251–52, 104 S.Ct. 615, 623, 78 L.Ed.2d 443, 454–55 (1984); *Kennedy v. Collagen Corp., supra*, 67 F.3d at 1456, we find that appellee's state claims based upon the design, manufacture, and sale of the VSP bone plates and screws have not been preempted by federal law.

It may well serve to reiterate the precise nature of this ruling—namely, the preemption of all state common law

claims asserted against the manufacturer of a Class II medical device which entered the market via the 510(k) process as the substantial equivalent of a grandfathered device, is not warranted under federal or state law where there are no requirements, other than package labeling approval, imposed by federal law.

## FAILURE TO WARN

 The FDA regulations affecting package labeling, however, preclude any state common law action based upon the adequacy of those warnings and instructions. The FDA regulates the labeling and packaging of medical devices such as the bone plates and screws manufactured by AcroMed. *See, e.g.,* 21 C.F.R. §§ 801.1, 801.4, 801.5, 801.6, 801.15, 801.16, 801.109; *Green v. Dolsky, supra,* 433 Pa.Super. at 567, 641 A.2d at 606. Any strict liability, negligence or implied warranty claims premised on inadequate warnings supplied by AcroMed are, therefore, preempted as a result of these federal requirements affecting the contents of labels and package inserts.

 All of the appellate courts which have addressed this issue have found, as do we, that the labeling regulations imposed by the FDA preempt all state tort claims based upon the inadequacy or inaccuracy of those warnings since a finding of negligence based upon such labeling *would* establish a standard for an adequate warning which would be "in addition to" the FDA labeling regulations. Such an action is thus preempted by the express provisions of Section 360k(a).[5] *See, e.g.: Feldt v. Mentor Corp., supra,* 61 F.3d at 435; *Lohr v. Medtronic, Inc., supra,* 56 F.3d at 1351; *Michael v. Shiley, Inc., supra,* 46 F.3d at 1324; *Reeves v. AcroMed Corp., supra,* 44 F.3d at 305; *Mendes v. Medtronic, Inc., supra,* 18 F.3d at 18; *Stamps v. Collagen Corp.,* 984 F.2d 1416 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993); *Moore v. Kimberly–Clark Corp., supra,* 867 F.2d at 247;

5. As a result of our decision, the alternative argument of appellant that it was entitled to summary judgment as to the claims of appellee based upon the failure to warn and failure to provide sufficient information on the use of the device, due to the application of the learned intermediary doctrine, is moot.

*Brown v. Medtronic, supra,* 852 F.Supp. at 720–21; *Bravman v. Baxter Healthcare Corp.,* 842 F.Supp. 747, 760 (S.D.N.Y. 1994); *Rinehart v. International Playtex, Inc.,* 688 F.Supp. 475, 477 (S.D.Ind.1988); *Green v. Dolsky, supra* at 567, 641 A.2d at 606.

Thus, it is that we affirm that portion of the order which denied summary judgment as to all claims based upon the manufacture and sale of the nested bone plates and screws, and reverse only that portion of the order which denied summary judgment as to the claims of appellee based upon inadequate labeling and warning. The case is, therefore, remanded for trial upon all claims other than those concerning failure to warn. *King v. Collagen Corp.,* 983 F.2d 1130, 1136 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993).

Order affirmed in part and reversed in part. Case remanded. Jurisdiction relinquished.