669 A.2d 959

**Ronald ROSCI and Kimberly Rosci, H/W**

v.

**ACROMED, INC.**

**Ronald ROSCI and Kimberly Rosci, H/W**

v.

**THOMAS JEFFERSON UNIVERSITY HOSPITAL, and Sanford H. Davne, M.D., Donald L. Myers, M.D., and Edwin Ferrin, M.D.**

Superior Court of Pennsylvania.

Argued June 6, 1995.

Filed Dec. 19, 1995.

404

Joseph L. Messa, Jr. and Mark W. Tanner, Philadelphia, and Thomas W. Sheridan, Downington, for appellants.

Louis A. Bove, Philadelphia, for Acromed, Inc., appellee.

Mark Herrmann, Pro Hac Vice, Cleveland, Ohio, for Acromed, Inc., appellee.

Michael D. Fishbein, Philadelphia, for Legal Committee in MDL 1014, Amicus Curiae.

Before McEWEN, TAMILIA, and KELLY, JJ.

McEWEN, Judge:

Appellant, Ronald Rosci, injured his back in 1986 and was diagnosed by Donald L. Myers, M.D., a neurosurgeon, and Sanford Davne, M.D., an orthopedic surgeon, as suffering from two herniated discs of his lumbar spine. Appellant underwent L3–4 and L4–5 diskectomies with an L/3/4/5 fusion on November 11, 1986, during the course of which Dr. Davne

removed the two discs between the lumbar vertebrae and implanted VSP nested bone plates and cancellous bone screws, manufactured by appellee AcroMed Corporation and sold under the trade name "VSP bone plates" and "VSP bone screws", as temporary aids to healing so that the three vertebrae abutting the disc spaces would fuse. Dr. Davne testified in his deposition that he was aware that the VSP bone plates and screws had been approved by the FDA for use only as fixation devices in the long bones and that his use was an "off-label" use. *See: Reeves v. AcroMed Corp.*, 44 F.3d 300, 305 (5th Cir.1995). Dr. Davne also testified that he was aware of the warnings, contained in the package with the bone plates and screws, which provided:

*WARNINGS, PRECAUTIONS, AND ADVERSE EFFECTS CONCERNING TEMPORARY METALLIC INTERNAL FIXATION DEVICES*

*WARNINGS*

1. CORRECT SELECTION OF THE IMPLANT IS EXTREMELY IMPORTANT. The potential for satisfactory fixation is increased by the selection of the proper size, shape, and design of the implant. While proper selection can help minimize risks, the size and shape of human bones present limitations on the size, shape and strength of implants. Metallic internal fixation devices cannot withstand activity levels equal to those placed on normal healthy bone. No implant can be expected to withstand indefinitely the unsupported stress of full weight bearing.

2. IMPLANTS CAN BREAK WHEN SUBJECTED TO THE INCREASED LOADING ASSOCIATED WITH DELAYED UNION OR NONUNION. Internal fixation appliances are load sharing devices which are used to obtain an alignment until normal healing occurs. If healing is delayed, or does not occur, the implant may eventually break due to metal fatigue. The degree of success of union loads produced by weight bearing and activity levels will, among other conditions, dictate the longevity of the implant. Notches, scratches, or bending of the implant during the course of surgery may also contribute

to early failure. Patients should be fully informed of the risks of implant failure.

3. MIXING METALS CAN CAUSE CORROSION. There are many levels of corrosion damage and several of these occur on metals surgically implanted in humans. General or uniform corrosion is present on all implanted metals and alloys. The rate of corrosive attack on metal implant devices is usually very low due to the presence of passive surface films. Dissimilar metals in contact, such as titanium and stainless steel accelerates the corrosion process of stainless steel and more rapid attack occurs. The presence of corrosion often accelerates fatigue fracture of implants. The amount of metal compounds released into the body system will also increase. Internal fixation devices, such as rods, hooks, wires, etc. which come into contact with other metal objects must be made from like or compatible metals.

4. PATIENT SELECTION. In selecting patients for internal fixation devices, the following factors can be of extreme importance to the eventual success of the procedure.

A. The patient's weight. An overweight or obese patient can produce loads on the device which can lead to failure of the appliance and the operation.

B. The patient's occupation or activity. If the patient is involved in an occupation or activity which includes substantial walking, running, lifting or muscle strain, the resultant forces can cause failure of the device.

C. A condition of senility, mental illness, alcoholism, or drug abuse. These conditions, among others, may cause the patient to ignore certain necessary limitations and precautions in the use of the appliance, leading to implant failure or other complications.

D. Certain degenerative diseases. In some cases, the progression of degenerative disease may be so advanced at the time of implantation that it may substantially decrease the expected usefulness of the appliance. For

such cases, orthopaedic devices can only be considered a delaying technique or temporary relief.

E.  Foreign body sensitivity.  Where material sensitivity is suspected, appropriate tests should be made prior to material selection or implantation.

## PRECAUTIONS

1. SURGICAL IMPLANTS MUST NEVER BE REUSED.  An explanted metal implant should never be reimplanted.  Even though the device appears undamaged, it may have small defects and internal stress patterns which may lead to early breakage.

2. CORRECT HANDLING OF THE IMPLANT IS EXTREMELY IMPORTANT.  Contouring of metal implants should only be done with proper bending equipment.  The operating surgeon should avoid any notching, scratching, or reverse bending of the devices when contouring.  Alterations will produce defects in surface finish and internal stresses which may become the local point for eventual breakage of the implant.  *Bending of screws will significantly decrease fatigue life and may cause failure.*

3. REMOVAL OF THE IMPLANT AFTER HEALING.  Metallic implants can loosen, fracture, corrode, migrate, possibly increase the risk of infection, cause pain or stress shield bone even after healing, particularly in young, active patients.  The surgeon should carefully weigh the risks versus benefits when deciding whether to remove the implant.  Implant removal should be followed by adequate postoperative management to avoid refracture.  If the patient is older and has a low activity level, the surgeon may choose not to remove the implant thus eliminating the risks involved with a second surgery.

4. ADEQUATELY INSTRUCT THE PATIENT.  Postoperative care and the patient's ability and willingness to follow instructions are among the most important aspects of successful bone healing.  The patient must be made aware of the limitations of the implant and that physical activity and full weight bearing have been implicated in

premature failure of metallic internal fixation devices by loosening, bending, or fracture. The patient should understand that a metallic implant is not as strong as normal healthy bone and will fracture if excessive demands are placed on it in the absence of complete bone healing. An active debilitated, or demented patient who cannot properly use weight supporting devices may be particularly at risk during postoperative rehabilitation.

### POSSIBLE ADVERSE EFFECTS

1. Nonunion, delayed union
2. Bending or fracture of implant. Loosening of the implant.
3. Metal sensitivity, or allergic reaction to a foreign body.
4. Infection.
5. Decrease in bone density due to stress shielding.
6. Pain, discomfort, or abnormal sensations due to presence of the device.
7. Nerve damage due to surgical trauma.
8. Bursitis.
9. Dural leak.
10. Paralysis.
11. Death.

A diagnostic x-ray taken of Mr. Rosci approximately four months after the surgery revealed that two of the bone screws had broken in place, that one of the bone plates had shifted and bent, and that the vertebrae had not fused. Appellant, permanently disabled as a result of the failure of the bone to fuse, filed a medical malpractice action against Dr. Davne, Dr. Myers, and Thomas Jefferson Hospital and, more than one year thereafter, instituted the instant action against AcroMed seeking damages based upon strict liability,[1]

1. Paragraph 17 of the complaint alleged:

   17. The injuries and damages set forth by plaintiff in the aforesaid paragraphs were directly and proximately caused by Acromed, as well as their agents, whose conduct or lack thereof consisted of the following:

negligence,[2] and breach of implied and express

(a) Failure to properly manufacture and inspect the Acromed VSP Medical Hardware;

(b) Failure to discover the defects in the Acromed VSP Medical Hardware;

(c) Failure to properly warn of the defective condition of the Acromed VSP Medical Hardware;

(d) Failure to use reasonable care in the design of the Acromed VSP Medical Hardware;

(e) Failure to use reasonable care in instructing and/or warning persons in plaintiff's position and persons in the positions of plaintiff's surgeons regarding the use of the Acromed VSP Medical Hardware;

(f) Carelessly representing to users of the Acromed VSP Medical Hardware that they were safe for their intended use;

(g) Failure to use reasonable care in the maintenance and inspection of the Acromed VSP Medical Hardware;

(h) Increasing the risk of harm to plaintiffs;

(i) Failure to warn plaintiff of the unreasonably dangerous and ultrahazardous condition;

(j) Permitting the condition to exist which created an unreasonably dangerous and hazardous condition to the plaintiff;

(k) Failure to correct the conditions which existed when the Acromed VSP Medical Hardware was originally designed, manufactured and delivered;

(*l*) Committing such other acts or omissions constituting negligence and carelessness as may be revealed during the course of the discovery proceedings in this case.

2. Paragraph 23 of the complaint alleged:

23. The aforesaid negligence of defendant, Acromed, as well as their agents, consists of the following:

(a) Failure to use reasonable care in the manufacture of the Acromed VSP Medical Hardware;

(b) Failure to use reasonable care in the design of the Acromed VSP Medical Hardware;

(c) Failure to use reasonable care in instructing and/or warning persons in plaintiff's position or in the position of plaintiff's physicians regarding the use of said Acromed VSP Medical Hardware;

(d) Carelessly representing to users of said Acromed VSP Medical Hardware, that it was safe for its intended use;

(e) Failure to use reasonable care in the maintenance and inspection of said Acromed VSP Medical Hardware;

(f) Failure to provide Thomas Jefferson University Hospital, Donald Myers, M.D., Sanford Davne, M.D., Edwin L. Ferrin, M.D., and/or any other entity who received this Medical Hardware in the stream of commerce, with the appropriate Medical Hardware when it knew or should have known of its intended use;

(g) Failure to provide adequate instructions for the aforementioned Medical Hardware;

(h) Increasing the risk of harm to plaintiff;

(i) Failure to warn plaintiff of the dangerous and ultrahazardous condition which resulted in his injuries;

warranties.[3]  All of the claims against AcroMed, other than those based on breach of warranty, were dismissed by the trial court on motion of appellee based upon the expiration of the applicable statute of limitations, 42 Pa.C.S. § 5524, and the malpractice action has been resolved.  AcroMed then filed a motion seeking summary judgment in its favor on the remaining claims, contending that the claims based on implied and express warranties were preempted by the Medical Device Amendments of 1976 (the "MDAs"), 21 U.S.C. §§ 360c *et seq.*, to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*  AcroMed argued in the alternative that the warranty claims were also barred by virtue of the learned intermediary doctrine.

The learned Judge Sandra Mazer Moss granted the motion of AcroMed for summary judgment, finding that, although the breach of warranty claims of appellants had not been preempted, the warranty claims were barred as a result of the learned intermediary doctrine.  For the reasons that follow, we affirm in part and reverse in part the order which granted summary judgment in favor of AcroMed.

Rule 1035 of the Rules of Civil Procedure provides, in relevant part:

(a) After the pleadings are closed, but within such time as not to delay trial, any party may move for summary judgment on the pleadings and any depositions, answers to interrogatories, admissions on file and supporting affidavits.

(b) The adverse party, prior to the day of hearing, may serve opposing affidavits.  The judgment sought shall be

---

(j) Permitting the condition to exist which created an unreasonably dangerous condition to the plaintiff;

(k) Failure to correct the conditions that existed when the Medical Hardware was originally designed, manufactured and delivered;

(*l*) Committing such other acts or omissions constituting negligence and carelessness as may be revealed during the discovery proceedings in this case.

**3.** Paragraph 26 of the complaint alleged:

26.  Defendant, Acromed, impliedly and expressly warranted that the aforesaid Medical Hardware was safe for use by persons in plaintiff's position, and/or in the position of plaintiff's physicians, and fit for the purpose for which they were intended.

rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

\* \* \* \* \* \*

(d) Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the signer is competent to testify to the matters stated therein . . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Pa.R.Civ.P. 1035.

■ Our standard of review in an appeal from an order granting summary judgment is plenary. We apply the same standard as the trial court, reviewing all of the documentary evidence of record to determine whether there exists a genuine issue of material fact that would preclude the entry of summary judgment and, if not, whether the moving party is entitled to judgment in its favor as a matter of law. *See: Marks v. Tasman,* 527 Pa. 132, 134–135, 589 A.2d 205, 206 (1991).

Appellee AcroMed argues that the trial court properly granted its motion for summary judgment because the claims of appellee based upon breach of warranty, while barred by the learned intermediary doctrine, were also preempted by the MDAs as the claims were based upon literature and warnings which were subject to regulation by the FDA pursuant to 21

C.F.R. §§ 801.1, 801.4, 801.5, 801.6, 801.109, 801.15, and 801.16.

## THE MDAs

The Medical Device Amendments of 1976 ("the MDAs"), 21 U.S.C. §§ 360c–360k (Supp.1995), to the Federal Food, Drug, and Cosmetic Act of 1938, 21 U.S.C. §§ 301 *et seq.,* were enacted:

"To assure the reasonable safety and effectiveness of medical devices intended for human use." H.Conf.Rep. No. 1090, 94th Cong. 2d Sess. reprinted in 1976 U.S.Code Cong. & Admin.News 1070, 1103. The MDA gives the FDA broad powers to classify and regulate medical devices. Under the MDA, the FDA must assign a medical device to one of three statutorily delineated categories. Class I devices are those devices which pose little or no threat to public health. They are subject to only general requirements concerned with their manufacture. Tongue depressors are one example of a Class I medical device. *See:* 21 U.S.C. § 360c(a)(1)(A); 21 C.F.R. § 860.3(c)(1). *Class II devices include items such as tampons and oxygen masks. Use of Class II devices involves some risk of injury and, as a result, the FDA establishes performance standards, postmarket surveillance programs and guidelines for their use. See:* 21 U.S.C. § 360c(a)(1)(B); 21 CFR § 860.3(c)(2). Class III devices are those devices which are implanted in the body or which pose a potentially unreasonable risk of injury. *See:* 21 U.S.C. § 360c(a)(1)(C); 21 CFR § 860.3(c)(3). They include Zyderm, as well as pacemakers, heart valves and replacement joints. Because of their inherent dangerousness, Class III devices are subject to the most stringent FDA regulation. All Class III devices are required to obtain premarket approval prior to being released for sale and use. 21 U.S.C. § 360e; 21 CFR § 814.1(c).

*Kennedy v. Collagen Corp.,* 67 F.3d 1453, 1455 (9th Cir.1995) (emphasis supplied). *Accord: Feldt v. Mentor Corp.,* 61 F.3d 431, 433 (5th Cir.1995); *Lohr v. Medtronic, Inc.,* 56 F.3d 1335, 1339–40 (11th Cir.1995); *Michael v. Shiley, Inc.,* 46 F.3d 1316, 1319 (3rd Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 67, 133

L.Ed.2d 29 (1995); *Talbott v. C.R. Bard, Inc.*, 865 F.Supp. 37, 42–43 (D.Mass.1994), *aff'd.*, 63 F.3d 25 (1st Cir.1995); *Green v. Dolsky*, 433 Pa.Super. 556, 561–563, 641 A.2d 600, 603, *allo. granted*, 539 Pa. 678, 652 A.2d 1324 (1994).

The VSP bone plates and screws manufactured by AcroMed have been designated as Class II medical devices. 21 C.F.R. § 888.3030(b). Although as a general rule Class II and Class III devices must obtain Premarket Approval (PMA) before they may be marketed to the public, 21 U.S.C. § 360e(a), the MDAs grandfathered into the market all devices introduced before May 28, 1976, the effective date of the Act, *see:* 21 U.S.C. § 360e(b)(1)(A); 21 C.F.R. § 814.1(c)(1), and permit the sale of a device without PMA where the device is the "substantial equivalent" of a device already on the market, including a device which was grandfathered into the market by virtue of having been first sold prior to May 28, 1976. 21 U.S.C. § 360e(b)(1)(B); 21 C.F.R. § 807.87.

> The Pre–Market Notification [PMN] process requires applicants *to submit descriptions* of their devices and other information necessary for the agency to determine whether the devices are substantially equivalent. As with the Pre–Market Approval process, Pre–Market Notification applicants must also submit their proposed labeling. *Id.* If the FDA determines that a device is substantially equivalent to a device that was on the market prior to the enactment of the MDAs in 1976, the applicant is free to market the device.

*Reeves v. AcroMed Corp.*, 44 F.3d 300, 303 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2251, 132 L.Ed.2d 258 (1995) (emphasis supplied). *See also: Lohr v. Medtronic, Inc., supra,* 56 F.3d at 1340; 21 U.S.C. § 360(k), 360c(f)(1).

The VSP bone plates and screws at issue in the instant case were designated as Class II medical devices, as a result of proceeding through the PMN process,[4] as the substantial equivalents of earlier marketed devices.

4. William R. Christianson, the Vice President of Regulatory Affairs and Quality Assurance for AcroMed Corporation described in his affidavit of

The FDA has issued only one regulation specifically applicable to bone plates and screws, and its purpose is to classify long bone screws and plates as Class II medical devices:

### § 888.3030 Single/multiple component metallic bone fixation appliances and accessories.

(a) *Identification.* Single/multiple component metallic bone fixation appliances and accessories are devices intended to be implanted consisting of one or more metallic components and their metallic fasteners. The devices contain a plate, a nail/plate combination, or a blade/plate combination that are made of alloys, such as cobalt-chromium-molybdenum, stainless steel, and titanium, that are intended to be held in position with fasteners, such as screws and nails, or bolts, nuts, and washers. These devices are used for fixation of fractures of the proximal or distal end of long bones, such as intracapsular, intertrochanteric, intercervical, supracondylar, or condylar fractures of the femur; for fusion of a joint; or for surgical procedures that involve cutting a bone. The devices may be implanted or attached through the skin so that a pulling force (traction) may be applied to the skeletal system.

(b) *Classification.* Class II.

21 C.F.R. § 888.3030. Other than this identification and classification regulation, the parties have not directed this Court to, nor have we found, any other FDA regulations *specifically* applicable to long bone screws and plates. However, the FDA, pursuant to the MDAs, regulates all aspects of

February 16, 1994, the PMN process in which AcroMed participated prior to marketing the VSP plates and screws:

AcroMed's nested bone plates and cancellous bone screws were submitted to the FDA pursuant to the FDA's 510(k) pre-market notification procedure. In 1985, AcroMed submitted a 510(k) application for its nested bone plates. In 1986, AcroMed submitted a similar notification for its cancellous bone screws. These notifications included the information required by the FDA to make substantial equivalence determinations, including examples of pre–1976 devices, design specifications, and proposed labeling. AcroMed's nested bone plates and cancellous bone screws were cleared for marketing by the FDA under the 510(k) provisions in February 1986. A modified version of AcroMed's cancellous bone screws was subsequently cleared for marketing by the FDA in January 1988.

the labeling and packaging of medical devices such as the bone plates and screws manufactured by AcroMed. *See, e.g.,* 21 C.F.R. §§ 801.1, 801.4, 801.5, 801.6, 801.15, 801.16, 801.109; *Green v. Dolsky, supra* at 561–563, 641 A.2d at 603. Thus mindful, we proceed to consideration of whether the MDAs preempt appellants' cause of action based upon inadequate labeling and warning.

## PREEMPTION

Appellee contends that all causes of action based upon the adequacy or inadequacy of the warnings and labeling provided by AcroMed are preempted by the express provisions of the MDAs.

Under the supremacy clause of the United States Constitution, federal law is "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, Cl. 2. As a result, all conflicts between federal and state laws must be resolved in favor of federal law. *Buzzard v. Roadrunner Trucking, Inc.,* 966 F.2d 777 (3d Cir.1992). In determining whether a conflict between state and federal law exists, a court looks to congressional intent. *FMC Corp. v. Holliday,* 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990), *appeal after remand,* 932 F.2d 959 (1991).

Generally, preemption may be express or implied, and it is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. *Id.* 498 U.S. at 56–57, 111 S.Ct. at 407, 112 L.Ed.2d at 363. "Congress' enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not preempted." *Cipollone v. Liggett Group, Inc.,* [505] U.S. [504], 517, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407, 423 (1992) (holding that the Federal Cigarette Labeling and Advertising Act of 1965 and its amendment preempted some but not all of a lung cancer victim's state law tort claims). When Congress is silent on the matter, state law will be preempted by federal law

"when (a) compliance with both state and federal law is impossible or, (b) when state law stands as an impediment to a federal purpose." *Hunsaker v. Surgidev Corp.*, 818 F.Supp. 744, 747 (M.D.Pa.1992).

*Green v. Dolsky, supra* at 561, 641 A.2d at 602–03.

The express preemption provision of the MDAs, 21 U.S.C. § 360k(a), provides:

[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use *any requirement*—

(1) *which is different from, or in addition to, any requirement applicable under this chapter to the device,* and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a) (emphasis supplied).

The FDA has interpreted this statutory preemption as applicable to state common law tort claims as well as state legislation. The regulations promulgated by the FDA pursuant to Section 360k provide:

[N]o State or political subdivision of a State may establish or continue in effect *any requirement* with respect to a medical device intended for human use having the force and effect of law *(whether established by statute,* ordinance, regulation, *or court decision* ) which is different from, *or in addition to,* any requirement applicable to such device under any provision of the act....

21 C.F.R. 808.1(b) (emphasis supplied).

However, those same regulations further explain that:

State or local requirements are preempted *only* when the Food and Drug Administration has established *specific counterpart regulations or there are other specific requirements applicable to a particular device under the act,* thereby making any existing divergent State or local requirements applicable to the device *different from, or in*

*addition to, the specific Food and Drug Administration requirements.*

21 C.F.R. 808.1(d) (emphasis supplied).

This Court in *Burgstahler v. AcroMed, Inc.,* —— Pa.Super. ——, 670 A.2d 658 (1995), held that a state tort action involving injury caused by a Class II medical device will not be preempted by Section 360k of the MDAs, unless there is a *specific* FDA requirement or regulation applicable to the device at issue so that the state court ruling sought by the plaintiff would result in the imposition of a requirement different from or in addition to a FDA requirement. *See also: Michael v. Shiley, Inc., supra,* 46 F.3d at 1323; *National Bank of Commerce v. Kimberly–Clark Corp.,* 38 F.3d 988, 997 (8th Cir.1994); *Moore v. Kimberly–Clark Corp.,* 867 F.2d 243, 246 (5th Cir.1989); *Ginochio v. Surgikos, Inc.,* 864 F.Supp. 948, 953 (N.D.Cal.1994); *Parenteau v. Johnson & Johnson Orthopedics, Inc.,* 856 F.Supp. 61, 64–65 (D.N.H.1994); *Brown v. Medtronic, Inc.,* 852 F.Supp. 717, 721 (S.D.Ind.1994); *Mulligan v. Pfizer, Inc.,* 850 F.Supp. 633, 635–37 (S.D.Ohio 1994); *Elbert v. Howmedica Inc.,* 841 F.Supp. 327, 331 (D.Haw.1993); *Lamontagne v. E.I. Du Pont de Nemours & Co.,* 834 F.Supp. 576, 582–86 (D.Conn.1993), *aff'd.,* 41 F.3d 846 (2d Cir.1994); *Larsen v. Pacesetter Sys. Inc.,* 74 Haw. 1, 15–17, 837 P.2d 1273, 1282 (1992). Thus, if a verdict in favor of appellants on the claims based upon breach of warranty would result in the imposition of a requirement in addition to those imposed by the labeling requirements of the MDAs, the action is preempted.

**IMPLIED WARRANTIES**

Appellants contend that the implied warranties of merchantability and fitness for a particular purpose which arise from general principles of state contract law, 13 Pa.C.S. §§ 2314, 2315; *Michael v. Shiley Inc., supra,* 46 F.3d at 1324, are not barred either by Section 360k of the MDAs or by application of the learned intermediary doctrine. We have already determined in the opinion issued in *Burgstahler v. AcroMed, Inc., supra,* that the implied warranties of merchantability and fitness for a particular purpose are preempt-

ed by the MDAs. *See also: Michael v. Shiley, Inc., supra,* 46
F.3d at 1324–25; *Reeves v. AcroMed Corp, supra,* 44 F.3d at
305; *Green v. Dolsky, supra* at 567–70, 641 A.2d at 606–07.[5]

## EXPRESS WARRANTIES

■ The Uniform Commercial Code, which is applicable to
the sale of the VSP bone plates and screws manufactured and
sold by appellee, provides that *express* warranties may be
created as follows:

> (1) *Any affirmation of fact* or promise made by the seller to
> the buyer which relates to the goods and becomes part of
> the basis of the bargain creates an express warranty that
> the goods shall conform to the affirmation or promise.
> (2) *Any description of the goods* which is made part of the
> basis of the bargain creates an express warranty that the
> goods shall conform to the description.

13 Pa.C.S. § 2313 (emphasis supplied).

"Express warranties arise from the representations of the
parties which are made the basis of the bargain and do not
result from the independent operation of state law. *See:* 13
Pa.C.S. § 2313.... The parties to a contract, not the state,
define the substantive obligations of the contract and hence
any express warranties. While the state provides for the
enforcement of the parties' bargain, it does not define each
party's duties." *Michael v. Shiley, Inc., supra,* 46 F.3d at
1325 (footnote omitted).

AcroMed provided the following express warranty on its
order sheet:

> Limited Warranty
>
> AcroMed Corporation warrants all of its catalog products to
> the original purchaser against defects in workmanship and
> materials for 90 days from date of purchase from AcroMed
> Corporation. Purchaser may return alleged defective prod-

---

**5.** Our conclusion that all claims based upon implied warranties have
been preempted by the MDAs renders moot the question of whether the
learned intermediary doctrine precludes an action based upon breach
of implied warranties. *See: Burgstahler v. AcroMed,* —— Pa.Super.
——, —— n. 5, 670 A.2d. 658, 666 n. 5 (1995).

ucts for full credit or refund in the amount of the purchase price or the repair or replacement of the product at AcroMed's option, plus shipping. AcroMed warranties are limited exclusively to these express warranties and any other warranties of any kind or description whatsoever and by whomsoever, including warranties of merchantability or fitness, express or implied, are hereby disclaimed unless otherwise stated in writing by AcroMed.

The package insert provided, *inter alia*, the following express representations of fact, giving rise to an express warranty that the bone plates and screws will conform to the following descriptions:

**Bone Screws**

The VSP Bone Screws are fabricated from ASIMF1314 implant grade stainless steel, and are composed of two parts: a long cancellous section with an integral fixed lower nut, and a machine threaded section topped with an hexagonal drive head.

The screws and plates are adjoined utilizing a double nut locking system. The screw features an integral fixed lower nut that is machined directly from the same piece of metal stock.

**Bone Plates**

The VSP Bone Plates are fabricated from ASIMF1314 implant grade stainless steel. The plates have nested slots and variable lengths to provide surgical latitude. The plates have between one and five slots. (44 mm. to 196mm length) with their length increasing by half slot increments. Longer slots are available as special order items.

The slots, with their precisely machined tapered nests offer the possibility of accurate yet variable screw placement. It is important that the plates be bent in a plate bender to mirror or to create the desired anatomic curves.

Use the shortest plate possible for each procedure. Minimal plate length will reduce the possibility of plate interference with other bony structures.

**Washers**

To optimize proper plate/screw/bone alignment there are washers available in 3mm and 5mm heights. A tapered, or wedge-shaped washer is available to fill nonsymmetric gaps. All washers have a chambered inner hole for proper fit over the integral nut. All are manufactured from implant grade stainless steel.

The distinguished Judge Leonard I. Garth of the United States Court of Appeals for the Third Circuit Court, in refusing to find that the MDAs preempted a state tort claim based upon breach of an express warranty[6] made in connection with the sale of a pacemaker, relied upon the reasoning, which we find controlling, of the United States Supreme Court in *Cipollone v. Liggett Group Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992):

> A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty. Accordingly, the "requirements" imposed by an express warranty claim are not "imposed under State law," but rather imposed *by the warrantor*.... In short, a common law remedy for a contractual commitment voluntarily undertaken should not be regarded as a "requirement ... *imposed under State law*"....

*Michael v. Shiley, Inc.*, *supra*, 46 F.3d at 1326, *quoting*, *Cipollone v. Liggett Group Inc.*, *supra*, 505 U.S. at 524–25, 112 S.Ct. at 2622, 120 L.Ed.2d at 428–429. In reaching the conclusion that claims based upon the breach of an express warranty were not preempted, Judge Garth noted:

> Congress has not only remained silent as to whether it intended to prevent states from enforcing the contractual representations of medical device manufacturers, it gave indications in 21 U.S.C. § 360h that at least some common law remedies would remain in conjunction with FDA regulation.

**6.** The warranty in *Michael v. Shiley, Inc.*, *supra*, 46 F.3d at 1321, provided:

> Shiley warrants that reasonable care has been used in the manufacture of this device. This warranty is exclusive and in lieu of all other warranties, whether express, implied, written or oral.

*Michael v. Shiley, Inc., supra,* 46 F.3d at 1326. *See also: Mitchell v. Collagen Corp.,* 67 F.3d 1268, 1282 (7th Cir.1995).

We agree with the reasoning of the *Shiley* Court because the judicial enforcement of an express warranty, even where the warranty terms have previously been submitted for approval by the FDA pursuant to the provisions of the MDAs, cannot result in an order or opinion imposing a requirement under state law that is "different from, or in addition to . . . any requirement applicable under this chapter to the device." 21 U.S.C. · § 360k. Rather, the purpose · of such litigation would be to seek enforcement of the express terms already approved by the FDA. Thus, the express warranty claim of appellants is not preempted by the MDAs. *See: American Airlines Inc. v. Wolens,* — U.S. ——, ——, 115 S.Ct. 817, 824, 130 L.Ed.2d 715, 725–726 (1995); *Mitchell v. Collagen Corp., supra,* 67 F.3d at 1285.

## LEARNED INTERMEDIARY DOCTRINE

■ The trial court granted summary judgment in favor of appellee on the express warranty claim based upon her conclusion that the learned intermediary doctrine precluded suit on an express warranty made in connection with the sale of a prescription device.

> The foundation of the [learned intermediary] doctrine was propounded in *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971), where the Supreme Court dealt with the issue of the duty of drug manufacturers to warn of potentially dangerous side effects of their products and to whom the warning must be given. In reference to prescription drugs, the Court said, "[s]ince the drug was available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor." *Id.* at 285, 282 A.2d at 220.

> This Court discussed the rationale of the rule from *Incollingo* in *Leibowitz v. Ortho Pharmaceutical Corp.,* 224 Pa.Super. 418, 307 A.2d 449 (1973):

>> It is for the prescribing physician to use his own independent medical judgment, taking into account the data

supplied to him from the drug manufacturer, other medical literature, and any other source available to him, and weighing that knowledge against the personal medical history of his patient, whether to prescribe a given drug. *Id.* at 431, 307 A.2d at 457. Thus, the information supplied by the drug manufacturer is only one source a physician must consult and he is expected to make an independent medical judgment in determining whether a given drug is appropriate for a particular patient.

*Brecher v. Cutler,* 396 Pa.Super. 211, 218–20, 578 A.2d 481, 485 (1990). *See also: Taurino v. Ellen,* 397 Pa.Super. 50, 52–54, 579 A.2d 925, 927 (1990), *allo. denied,* 527 Pa. 603, 589 A.2d 693 (1991); *Makripodis v. Merrell–Dow Pharmaceuticals, Inc.,* 361 Pa.Super. 589, 596–98, 523 A.2d 374, 378 (1987).

■ Under the learned intermediary doctrine, as it is applied in Pennsylvania, a manufacturer will be held liable only where it fails to exercise reasonable care to inform the one for whose use the product is supplied of the facts which make the product likely to be dangerous. *Brecher, supra* at 218–20, 578 A.2d at 485; *Makripodis v. Merrell–Dow, supra* at 594–96, 523 A.2d at 377. The intended "user" in a case involving a prescription drug or device is, of course, the prescribing physician.

The learned intermediary doctrine, however, while applicable to implied warranties, has never been applied to bar an action by an injured consumer based upon breach of an *express warranty* since such a claim is unrelated to the issue of the warnings given to the prescribing physician and instead is based solely upon the express affirmation of fact made by the manufacturer.

Nor are we inclined by either jurisprudential sense or valid policy to extend the applicability of the doctrine to actions based upon breach of an express warranty. Appellee itself drafted the documents upon which the express warranty claim is predicated and should not be heard to defend its failure to conform to those representations solely because the literature in which they are contained was directed to the prescribing

physician rather than to the patient who was at all times the intended recipient of the product.

We, therefore, affirm that part of the order which granted summary judgment in favor of appellee AcroMed on the claims of appellants based upon breach of implied warranties, and reverse that portion of the order which granted summary judgment in favor of appellee on the express warranty claims of appellants.